1
2
3
4

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

|  |  |
|---|---|
| SHERRILL FARRELL, et al.,<br><br>                    Plaintiffs,<br><br>          v.<br><br>UNITED STATES DEPARTMENT OF DEFENSE, et al.,<br><br>                    Defendants. | Case No.  23-cv-04013-JCS<br><br>**ORDER DENYING MOTION TO DISMISS PLAINTIFFS' AMENDED COMPLAINT AND SETTING FURTHER CASE MANAGEMENT CONFERENCE**<br><br>Re: Dkt. No. 50 |

## I.  INTRODUCTION

This putative class action is brought by lesbian, gay, bisexual, transgender, queer/questioning, gender non-conforming, nonbinary, and intersex ("LGBTQ+") veterans who were discharged from the United States Armed Forces under "Don't Ask, Don't Tell" ("DADT") and similar predecessor policies that prohibited LGBTQ+ individuals from serving in the armed forces. Although the Government repealed DADT in 2010 and has recognized and condemned its past discriminatory policies, paperwork issued when Plaintiffs were discharged, including the DD-214 form that veterans use to access a variety of benefits, reflects their actual or perceived sexual orientation and their discharge status, which in some cases was dishonorable based on their sexual orientation.  There is a procedure in place that allows veterans to apply for a "correction" of their discharge papers, but Plaintiffs allege the procedure is lengthy and burdensome and that by failing to systematically correct the paperwork of all veterans who were discharged under these discriminatory policies, Defendants are violating the constitutional rights of Plaintiffs and the putative class members under the Fifth and Fourteenth Amendments.

Presently before the Court is Defendants' Motion to Dismiss Plaintiffs' Amended Complaint ("Motion").  A hearing on the Motion was held on February 2, 2024.  For the reasons

stated below, the Motion is DENIED.[1]

## II.    BACKGROUND

### A.    The First Amended Class Action Complaint

The First Amended Class Action Complaint, dkt. no. 43 ("FAC"), is the operative complaint in this case.  In the FAC, Plaintiffs allege that "between October 1, 1980, and September 20, 2011, 35,801 veterans received a discharge or separation from service 'because of real or perceived homosexuality, homosexual conduct, sexual perversion, or any other related reason[,]'" citing the Department of Defense's May 12, 2023 response to Legal Aid at Work's 2021 Freedom of Information Act request.  FAC ¶ 33.  According to Plaintiffs, "[v]eterans who were discharged for their actual or perceived sexual orientation often received discharge paperwork, the Form DD-214, that (1) identifies their actual or perceived sexual orientation as the reason for their discharge, (2) burdens them with discharge rankings below Honorable, and (3) bars them from reenlisting."  *Id.* ¶ 7.   All of the named plaintiffs allege that they were discharged because of their sexual orientation and that their sexual orientation is disclosed in their discharge papers.  *Id.* ¶¶ 16-20.  Four out of five of the named plaintiffs allege that they were discharged with a ranking below Honorable.  *Id.*

Plaintiffs allege that "[t]he Government's discriminatory discharges and resulting discharge paperwork have ripple effects throughout the lives of LGBTQ+ veterans[,]" as the circumstances of their discharge leads to isolation from family and other veterans and deprives them "of society's admiration for their service."  *Id.* ¶¶ 43-46. Plaintiffs allege that they are also deprived of many of the benefits that veterans enjoy, such as a veteran designation on an individual's state id. or driver's license that is offered by many states for veterans who received an honorable discharge.  *Id.* ¶ 47.   Further, Plaintiffs allege, other perks offered to veterans, such as discounts offered by stores and restaurants, "typically require proof of service, which means a veteran with a discriminatory DD-214 will reveal their sexual orientation if they provide proof of military service" and "[m]any LGBTQ+ veterans with a discharge status below Honorable are

---

[1] The parties have consented to the jurisdiction of a United States magistrate judge pursuant to 28 U.S.C. § 636(c).

excluded altogether." *Id.* ¶ 48. Thus, "[t]he harm of discriminatory DD-214s does not stop at the veterans' discharge[,]" Plaintiffs allege. *Id.* ¶ 49.  "It is pervasive and continues to harm a veteran's pride in service, honor, and sense of belonging among the veteran community and society at large." *Id.*

According to Plaintiffs, when DADT was repealed, the Department of Defense ("DoD") issued policy guidance that covered all military personnel serving in the Armed Forces.  *Id.* ¶ 53. "The guidance dictated that '[s]ervice members will no longer be subject to administrative separation based solely on legal homosexual acts, a statement by a [s]ervice member that he or she is a homosexual or bisexual (or words to that effect), or marriage or attempted marriage to a person known to be of the same biological sex.'" *Id.*  Moreover, Plaintiffs allege, "any service member who was already being processed for separation or investigated based solely on 'legal homosexual acts' had their 'separation cancelled, and they 'return[ed] to duty.'" *Id.*  Plaintiffs allege that the guidance "also required that any former service member who was discharged solely for legal 'homosexual' acts be allowed to re-enter the Armed Forces." *Id.*

At the same time, the DoD issued internal policy guidance in the form of a memorandum by Under Secretary of Defense for Personnel and Readiness, Dr. Clifford L. Stanley ("the Stanley Memo").  *Id.* ¶ 54; *see also* Motion, Ex. 1, dkt. no. 50-1 (Stanley Memo).  Because the Stanley Memo is expressly referenced in the FAC, the Court considers that document to be incorporated by reference in the FAC.  The Stanley Memo was promulgated in anticipation of "a large number of similar applications arising from the repeal of DADT" submitted by former service members to their Service Discharge Review Board ("DRB") or their Service Board for Correction of Military/Naval Records ("BCM/NR") in order to "help ensure consistency across the services[.]" Dkt. no. 50-1 at ECF p. 2.

According to Plaintiffs, the Stanley Memo "establish[ed] that the baseline was to grant veterans' requests for discharge upgrades following the repeal of DADT."  FAC ¶ 54.  In particular, Secretary Stanley stated in the memo that as of the repeal date:

> Service [Discharge Review Boards] should normally grant requests
> to change the narrative reason for a discharge (the change should be
> to "Secretarial Authority" (Separation program Designator Code

> (SPD) code JFF)), requests to re-characterize the discharge to honorable, and/or requests to change the reentry code to an immediately-eligible-to-reenter category . . . when both of the following conditions are met: (1) the original discharge was based solely on DADT or a similar policy in place prior to enactment of DADT and (2) there were no aggravating factors in the record, such as misconduct. Although each request must be evaluated on a case-by-case basis, the award of an honorable or general discharge should normally be considered to indicate the absence of aggravating factors.

*Id.* However, "Secretary Stanley's memo did not modify the existing record correction and discharge upgrade process." *Id.* ¶ 55.

In fact, in the Stanley Memo, DoD expressly found that broad remedial relief as to discharge paperwork was not required:

> Although the correction boards have wide latitude in determining what constitutes an error or injustice, it is DoD policy that broad, retroactive corrections of records from applicants discharged under DADT are not warranted.  Although DADT is repealed effective September 20, 2011, it was the law and reflected the view of Congress during the period of the law.

> Similarly, DoD regulations implementing various aspects of DADT were valid regulations during that same period. Thus, consistent with what we understand is past board practice  on changing standards, DADT's repeal may be a relevant factor in evaluating an application (such as requests to change the narrative reason  for a discharge, requests to re-characterize the discharge as honorable, and/or to change the reentry code to an immediately-eligible-to reenter category) but the issuance of a discharge under DADT should not by itself be considered to constitute  an error or injustice that would invalidate an otherwise proper action taken pursuant to DADT and applicable DoD policy. Thus, remedies such as correcting a record to reflect continued service with no discharge, restoration to a previous grade or position, credit for time lost or an increase from no separation pay to half or full separation pay or from half separation to full separation pay, would not normally be appropriate.

Motion, Ex. 1, dkt. no. 50-1 (Stanley Memo) at ECF p. 3.  According to Plaintiffs, in the years following the repeal of DADT, "only a relative handful of veterans have sought record corrections and discharge upgrades."  FAC ¶ 55.

Plaintiffs allege that there have been efforts in Congress to provide relief to veterans discharged under DADT, including a 2014 resolution that would have directed the Secretary of Defense to conduct a comprehensive review of records of service members discharged based on sexual orientation, but that these efforts have so far failed.  *Id.*  ¶¶ 58-59.  Likewise, they allege,

the Veteran's Administration ("VA") has announced that due to the "onerous" discharge upgrade process, it "would no longer deny VA-administered benefits to veterans with less than Honorable discharges if the reason for their discharge is related to sexual orientation, gender identity, or HIV status[,]" *Id.* ¶ 59, but that policy has yet to be implemented.  *Id.* ¶ 60.

Plaintiffs allege that "[t]he Government's continued failure to remediate the discriminatory effects of DD-214s containing indicators of sexual orientation, which touch on nearly every aspect of a veteran's life after service, constitutes ongoing discrimination and a deprivation of these veterans' constitutional rights."  *Id.* ¶ 67.  The FAC contains detailed allegations describing the burdens imposed on these veterans, which include invasion of privacy, *Id.* ¶¶ 71-75, and denial of access to benefits and hiring advantages, *Id.* ¶¶ 76-93.  For example, "Plaintiff Farrell was required to show her DD-214 to her employer as part of the application process for her job."  *Id.* ¶ 75.

With respect to state and federal benefits, Plaintiffs allege that "[r]eceipt of these benefits requires proving military service by disclosing a DD-214."  *Id.* ¶ 76.  Furthermore, they allege, "[d]ischarge status is critically important for accessing these benefits" as an "Honorable discharge entitles veterans to all available federal and state benefits, including healthcare benefits through VA hospitals, educational benefits through the GI Bill, housing benefits, unemployment benefits, and many others" while "[a]nything less than an Honorable discharge often bars service members from access to benefits."  *Id.* ¶ 77. Thus, for example, Plaintiff Gonzales, who is HIV positive, "has been unable to obtain healthcare benefits through the VA" because of his discharge status and has been able to receive only "sporadic medical care through a variety of nonprofit agencies." *Id.* ¶ 80. "Similarly unable to access VA health care, Plaintiff Powell did not have health insurance for approximately 13 years, during which time she was diagnosed with a medical condition that required two surgeries." *Id.* ¶ 81.  Likewise, Plaintiffs Gonzalez, Farrell and Powell, who had hoped to pursue further education after discharge under the GI Bill Program were ineligible for those benefits due to their discharge status.  *Id.* ¶¶ 82-85.  Plaintiffs allege that Plaintiff Steffanides "sought assistance from a veteran affairs organization when they were experiencing homelessness" but they "were told they did not qualify for temporary housing because of their

discharge status and because their DD-214 included a narrative reason that read 'Homosexuality – engaged in, attempted to engage in, or solicited another to engage in a homosexual act or acts.'" *Id.* ¶ 88. Plaintiffs allege that "[f]or nearly twenty-four years, Plaintiff Steffanides experienced homelessness and lived on the streets." *Id.* ¶ 88.

Plaintiffs allege that "there are two ways veterans can obtain records corrections and discharge upgrades—individually by each veteran's own initiative or as a group by Defendants' initiative." *Id.* ¶ 94. The former method, which is "authorized by 10 U.S.C. §§ 1552-53 and is substantially similar for each branch of the Armed Forces[,]" requires that the veteran "generally must submit a request to the Discharge Review Board or Board for Correction of Military Records for their branch of military service." *Id.* ¶ 95. The latter method is authorized under 10 U.S.C. § 1552(a)(1), which gives the Secretaries the authority to "correct any military record of the Secretary's department when the Secretary considers it necessary to correct an error or remove an injustice." *Id.* ¶ 96 (quoting10 U.S.C. § 1552(a)(1)). Under this provision, "'such corrections shall be made by the Secretary acting through' the Boards for Correction of Military Records [but] [t]he Secretaries may act entirely independently . . . 'in the case of the correction of a military record announcing a decision that a person is not eligible to enlist (or reenlist) . . . if the correction is favorable to the person concerned.'" *Id.* ¶ 96 (quoting 10 U.S.C. § 1552(a)(2)).

Plaintiffs also point to 10 U.S.C. § 1552(b), which "provides the Secretaries of each Military Department with the ability to independently 'file a request for correction of a military record only if the request is made on behalf of a group of members or former members of the armed forces who were similarly harmed by the same error or injustice.'" *Id.* ¶ 97. Moreover, Plaintiffs allege, "[f]ormal Department of Defense Instruction provides that '[t]he objective of a discharge review is to examine the propriety and equity of the applicant's discharge.'" *Id.* ¶ 98 (quoting DODI 1332.28, Encl. E4.1 (2004)). According to Plaintiffs, "[d]ischarges are deemed inequitable when 'it is determined that the policies and procedures under which the applicant was discharged differ in material respects from those currently applicable on a Service-wide basis to discharges of the type under consideration[.]'" *Id.* ¶ 98 (quoting DODI 1332.28, Encl. E4.3.1). Plaintiffs allege that while the Government "has provided mechanisms to address the

discriminatory discharge records issued under DADT and predecessor policies through widespread record corrections initiated by the Secretaries, Boards for Correction of Military Records, and/or Discharge Review Boards themselves, without placing additional burdens on the veterans harmed[,]" they have "failed to exercise that mechanism and correct these discriminatory discharge records on their own initiative, instead requiring veterans to individually apply for records corrections." *Id.* ¶ 99.

Plaintiffs allege that "[t]he existing system for veterans to seek record corrections is plagued by significant hurdles that uniquely burden veterans seeking corrections related to DADT and predecessor policies." *Id.* ¶100.  In particular, Plaintiffs allege, "[v]eterans face (1) lengthy delays in the correction process and financial burdens; (2) evidentiary burdens that must be carried by the individual applicant; (3) complicated and intimidating application processes; and (4) stigma, isolation, and re-traumatization resulting from the individualized process." *Id.*  ¶¶ 100-111.

Plaintiffs assert the following claims: 1) violation of Plaintiffs' right to Equal Protection under the Fifth and Fourteenth Amendments based on  the inclusion of sexual orientation information on discharge paperwork only as to LGBTQ+ veterans, constituting intentional discrimination (all Plaintiffs) (Claim One); 2) violation of Plaintiffs' right to Substantive Due Process and Privacy based on maintaining sexual orientation information on discharge paperwork, resulting in invasion of privacy (all Plaintiffs) (Claim Two); 3) violation of Plaintiffs' right to Substantive Due Process based on infringement of liberty interest in veterans' benefits resulting from less than Honorable discharge (Plaintiffs Farrell, Gonzales, Powell, and Steffanides) (Claim Three); 4) violation of Plaintiffs' right to procedural due process under the Fifth Amendment based on infringement of Plaintiffs' liberty interest in confidentiality and informational privacy and, as to Plaintiffs Farrell, Gonzales, Powell, and Steffanides, infringement of their property interest in veterans' benefits (all Plaintiffs) (Claim Four).

Plaintiffs seek declaratory relief in the form of a judicial declaration that Defendants' failure to systematically remove indicators of sexual orientation from veterans' discharge papers upon the repeal of DADT violates their rights to equal protection, substantive due process and procedural due process.  FAC, Prayer. They further seek a permanent injunction requiring

United States District Court
Northern District of California

Defendants to: 1) "conduct a comprehensive review of every discharge processed pursuant to DADT and its predecessor policies and systematically remove all indicators of sexual orientation—including (1) narrative reasons for separation, and (2) affiliated separation codes from veterans' DD-214s—and to provide, or make easily available, to each veteran a corrected copy of his, her, or their DD-214;" 2) "systematically upgrade discharge characterizations to Honorable in accordance with the above changes to DD-214s and notify all relevant federal agencies of the upgrade;" and 3) "systematically change reenlistment/reentry codes in accordance with the above changes to DD-214." *Id.*

## B.   Contentions of the Parties

### 1.   Motion

In the Motion, Defendants represent that since the guidance in the Stanley Memo was issued, military correction boards have reviewed "more than 1,683 applications by veterans for records correction and have granted relief to more than 1,406 former service members who, like Plaintiffs here, were discharged pursuant to the DADT policies." Motion at 1.  They further observe out that the DoD has recently "announced that it will proactively review cases of veterans whose records indicate their administrative separation was the result of their sexual orientation and who received a less than honorable discharge." *Id.* at 2.   According to Defendants, the DoD "will begin this process with respect to those veterans discharged during the DADT period (1994-2011)." *Id.*;  *see also*  FAC ¶¶ 62-65.  Defendants argue that all of Plaintiffs' claims should be dismissed for several reasons.

First, Defendants argue that Plaintiffs' claims are untimely.  Motion at 8-10.  In particular, they contend the applicable limitations period is six years and that "[f]or claims challenging a military discharge, or the service documents issued upon discharge, the six-year statute of limitations period 'begins to run when a service member's discharge is final.'" *Id.* at 8 (quoting *Kendall v. Army Bd. For Correction of Mil. Recs.*, 996 F.2d 362, 366 (D.C. Cir. 1993)). According to Defendants, because all of the Plaintiffs received their discharge paperwork more than six years ago, their claims are time-barred.  *Id.* (citing FAC ¶¶ 16-20, alleging that the five named plaintiffs were discharged in 1986, 1986, 1999, 2008, and 1989, respectively).  Moreover,

1    Defendants contend, the doctrine of equitable tolling – to the extent it may be alleged in the FAC –

2    does not apply because Plaintiffs have not alleged facts establishing that "an 'extraordinary

3    circumstance' made it impossible to file on time." *Id.* at 10 (quoting *Booth v. United States*, 914

4    F.3d 1199, 1207 (9th Cir. 2019)).

5         Next, Defendants argue that to the extent Plaintiffs challenge the procedures of the

6    Military Correction Boards, none has standing to bring such a challenge because they have not

7    applied for correction under those procedures and been denied. *Id.* at 10-11.  They acknowledge

8    in a footnote that "based on information in the Amended Complaint the Military Services have

9    searched their own records and have discovered that one Plaintiff—Hayden Powell—currently has

10   an application pending before the Air Force Board for Correction of Military Records." *Id.* at 17

11   n. 3.  They assert, however, that Powell cannot state a due process claim until her application has

12   actually been denied. *Id.* (citing *Nichols v. Hughes*, 721 F.2d 657, 659 (9th Cir. 1983); *Wenger v.

13   Monroe*, 282 F.3d 1068, 1072 (9th Cir. 2002)). They further assert that "even if Plaintiffs could

14   establish standing to challenge military correction board procedures without utilizing such

15   procedures, their claims would still need to be dismissed as non-justiciable because the Ninth

16   Circuit requires exhaustion of military remedies." *Id.* at 11 (citing *Wenger v. Monroe*, 282 F.3d

17   1068, 1072 (9th Cir. 2002)).

18        Similarly, Defendants contend that Plaintiffs lack standing to bring a claim for violation of

19   their informational privacy right (Claim Two) because "Plaintiffs do not allege a nonconsensual

20   disclosure of their private information." *Id.* at 12-13.  Defendants argue that under *TransUnion

21   LLC v. Ramirez*, 141 S. Ct. 2190 (2021), simply including private information on the discharge

22   paperwork does not give rise to concrete harm for the purposes of establishing standing. *Id.*

23   According to Defendants, none of the named plaintiffs has standing to bring this claim because

24   "four of the five Plaintiffs do not allege any disclosure of their discharge documents [ ] [a]nd

25   Plaintiff Farrell alleges that she disclosed her own discharge documents to her employer

26   voluntarily." *Id.*  at 13 (citing FAC ¶ 75).

27        Finally, Defendants argue that even if Plaintiffs' claims are timely and they have standing,

28   all of their claims fail under Rule 12(b)(6) because no constitutional violation has been plausibly

United States District Court
Northern District of California

alleged.  *Id.*  at 13-20.  As to Plaintiffs' equal protection claim, Defendants emphasize that the military correction board procedures are facially neutral and argue that Plaintiffs cannot plausibly allege that these procedures are characterized by any discriminatory purpose or effect.  *Id.* at 13-16.  According to Defendants, because of the favorable presumptions established under the Stanley Memo the success rate of applicants who were discharged under DADT and its predecessor policies is high.  *Id.* at 10, 16 (citing a statement on https://www.defense.gov/ Spotlights/ Dont-Ask-Dont-Tell-Resources/ noting that military correction boards had granted 1,406 of 1,683 requests for relief  -- 83.5% of requests -- as of March 2023).

Next, Defendants argue that Plaintiffs cannot assert claims for substantive or procedural due process violations that challenge the military correction board procedures without first having used those procedures.  *Id.*  at 17-18.

Defendants further assert that Plaintiffs' substantive and procedural due process claims are not plausibly alleged.  *Id.*  at 18-20.  As to Plaintiffs' substantive due process claims, Defendants contend Plaintiffs cannot prevail because they have not alleged that the military correction board procedures are "so egregious, so outrageous, that [they] may fairly be said to shock the contemporary conscience." *Id.*  at 18 (quoting *Fraternal Ord. of Police Dep't of Corr. Labor Comm. v. Williams*, 375 F.3d 1141, 1144-45 (D.C. Cir. 2004) (citation omitted)).  As to Plaintiff's procedural due process claim, Defendants assert that they need only offer a fair procedure and that nothing alleged in the FAC supports a plausible inference that that standard is not met. *Id.* at 19-20.

### 2.  Opposition

In their Opposition, Plaintiffs dismiss Defendants' suggestion that the existing "correction" procedure is adequate, comparing the small number of veterans who (according to Defendants) have applied to have their records corrected (1,683) and actually obtained that relief (1,406) with the number of veterans who allegedly were discharged based on their sexual orientation between October 1, 1980 and September 20, 2011 (35,801).  Opposition at 4 (citing Motion at 1, 2; FAC at ¶ 33).  Similarly, they note that while Defendants have acknowledged the "injustice" of the past policies and announced their intent to conduct a systematic review of the records of veterans

1   discharged under based on sexual orientation, they have not announced a timeline for conducting

2   this review and the initiative also will not cover veterans discharged under policies that preceded

3   DADT or veterans whose discharge was Honorable.  *Id.* (citing FAC ¶¶ 62-65).  Plaintiffs also

4   reject all of Defendants' challenges to their claims.

5          First, Plaintiffs agree that the applicable statute of limitations is found in 28 U.S.C. §

6   2401(a), "the federal 'catch all' limitations period[,]" but reject Defendants' argument that their

7   claims are untimely, arguing that their claims are timely under the continuing violation doctrine or

8   alternatively, under the doctrine of equitable tolling.  *Id.* at 6-7.  Plaintiffs assert that under the

9   continuing violation doctrine, " '[w]hen the continued enforcement of a statute inflicts a

10  continuing or repeated harm, a new claim arises (and a new limitations period commences) with

11  each new injury.' "  *Id.* at 6 (quoting *Flynt v. Shimazu*, 940 F.3d 457, 462 (9th Cir. 2019) (internal

12  citation omitted)).  Application of this doctrine is particularly appropriate, Plaintiffs contend, in

13  cases involving:  1) ongoing constitutional violations, *id.* (citing *Va. Hosp. Ass'n v. Baliles*, 868

14  F.2d 653, 663 (4th Cir. 1989), aff'd sub nom. *Wilder v. Va. Hosp. Ass'n*, 496 U.S. 498 (1990); also

15  *Palmer v. Bd. of Educ.*, 46 F.3d 682, 683 (7th Cir. 1995); *Brown v. Bd. of Educ.*, 347 U.S. 483

16  (1954)); 2) class actions alleging pattern or practice claims, *id.* (citing *Bird v. Dep't of Hum.

17  Servs.*, 935 F.3d 738, 748 (9th Cir. 2019)); and 3) claims for injunctive relief, *id.* (citing *Flynt*, 940

18  F.3d at 460)).  According to Plaintiffs, all three situations apply to this case.  *Id.*  at 7.  Therefore,

19  they assert, "Defendants' knowing decision to leave discriminatory discharge paperwork

20  uncorrected (despite having the ability to revise DD-214s), coupled with the requirement that

21  LGBTQ+ veterans apply through an individualized and constitutionally deficient process to

22  correct such paperwork, create a new injury every day" that starts a new period to sue, making

23  Plaintiffs' claims timely.  *Id.* (citing *Palmer v. Bd. of Educ.*, 46 F.3d 682, 685 (7th Cir. 1995)).

24         Plaintiffs argue that the cases cited by Defendants to support their position that the claims

25  are untimely are not on point because "they do not involve a putative class action seeking

26  injunctive relief for constitutional violations and/or are out-of-circuit district court opinions."  *Id.*

27  at 6 n. 5. In addition, Plaintiffs distinguish these cases on the ground that "they address the accrual

28  of a claim based on a veteran's discharge from the military —*see Nichols v. Hughes*, 721 F.2d

United States District Court
Northern District of California

657, 659 (9th Cir. 1983) ("a cause of action for *wrongful discharge* occurs at the time of discharge" (emphasis added)); *Kendall v. Army Bd. for Corr. of Mil. Recs.*, 996 F.2d 362, 366 (D.C. Cir. 1993) (same); *Martinez v. United States*, 333 F.3d 1295, 1303 (Fed. Cir. 2003) (same)—or an adverse determination by a correction Board—*see Davenport v. England*, 222 F. App'x 551, 552 (9th Cir. 2007)." *Id.* According to Plaintiffs, their claims "are not predicated on either of these occurrences." *Id.*

Plaintiffs argue that even if the continuing violation doctrine does not apply and the limitations period began to run when Plaintiffs were discharged, the claims are timely under the doctrine of equitable tolling. *Id.* at 7-8. According to Plaintiffs, that doctrine applies "when a litigant has been diligent and failed to file due to 'extraordinary circumstances.'" *Id.* (quoting *Doe v. Garland*, 17 F.4th 941, 946 (9th Cir. 2021), cert. denied, 142 S.Ct. 2815 (2022)). Plaintiffs contend they have alleged facts sufficient to meet this standard. *Id.* Furthermore, Plaintiffs assert, "[s]ince equitable tolling often depends on matters outside the pleadings, 'it is not generally amenable to resolution on a Rule 12(b)(6) motion.'" *Id.* at 8 (quoting *Cervantes v. City of San Diego*, 5 F.3d 1273, 1276 (9th Cir. 1993)). Therefore, they contend, a court may dismiss on the pleadings based on statute of limitations only where " 'the assertions of the complaint, read with the required liberality, would not permit the plaintiff to prove that the statute was tolled.'" *Id.* (quoting *Supermail Cargo, Inc. v. United States*, 68 F.3d 1204, 1206 (9th Cir. 1995) (citation omitted)).

Plaintiffs argue that they have alleged facts showing that they have "diligently pursued their rights as best they could in light of the obstacles they faced due to Defendants' actions," alleging in their FAC that "[n]ot only is the Record Correction Process time consuming, complex, intimidating, and retraumatizing (see FAC ¶ 100), but also it offers no class action remedy to provide systematic relief." *Id.* (citing FAC ¶¶ 100-11). According to Plaintiffs, "[t]o bring a class action to challenge the Government takes significant legal support, planning, coordination, and funding—none of which Plaintiffs had prior to bringing this action." *Id.* "This, combined with the continued promise of reform of the Record Correction Process—either through congressional action, state-based remedies, or agency workarounds (FAC ¶¶ 57-60)—discouraged

the initiation of a federal class action." *Id.*

Next, Plaintiffs argue that Defendants' arguments challenging "justiciability" fail. *Id.* at 8-14. As to the argument that Plaintiffs do not have standing to challenge the Record Correction Process without having actually applied for a correction through that process, Plaintiffs argue that in order to have standing to bring such a challenge they are required only to demonstrate that "they are 'able and ready' to apply so that they may be imminently subject to the challenged process." *Id.* at 9 (citing *Gratz v. Bollinger*, 539 U.S. 244, 261-62 (2003); *Ne. Fla. Chapter of Associated Gen. Contractors of Am. v. City of Jacksonville, Fla*., 508 U.S. 656, 666 (1993); *Planned Parenthood of Greater Wash. & N. Idaho v. U.S. Dep't of Health & Hum. Servs*., 946 F.3d 1100, 1108 (9th Cir. 2020)). Plaintiffs argue that they have alleged facts showing they are "able and ready" to apply and therefore they are "actually or imminently injured" by the application requirement and have standing to challenge the Record Correction Process. *Id.* at 9-10 (citing FAC ¶¶ 16-20, 36, 94-95, 101-111, 148-150). They also assert that Plaintiff Powell has suffered actual injury, having applied to a military correction board for correction of her records, and argue that *Nichols* does not support Defendants' assertion that Powell's application must have been denied before she has standing to assert a due process claim based on those procedures. *Id.* at 9-10. Plaintiffs further contend that their injury is "fairly traceable" to Defendants' conduct "as Defendants have authority over veterans' service records and are actively choosing not to exercise that authority to systematically correct affected veterans' DD-214s, thereby forcing Plaintiffs to utilize a constitutionally deficient Record Correction Process." *Id.* at 10.

Plaintiffs also argue that they are not required to exhaust administrative remedies, invoking the test set forth in *Mindes v. Seaman*, 453 F.2d 197, 201 (5th Cir. 1971), which was expressly adopted by the Ninth Circuit in *Wallace v. Chappell*, 661 F.2d 729, 732-35 (9th Cir. 1982). *Id.* at 10. Under *Mindes*, exhaustion of available intraservice remedies is one of the threshold requirements for justiciability but is excused " '(1) if the intraservice remedies do not provide an opportunity for adequate relief; (2) if the petitioner will suffer irreparable harm if compelled to seek administrative relief; (3) if administrative appeal would be futile; or (4) if substantial constitutional questions are raised.'" *Id.* at 11 (quoting *Wenger v. Monroe*, 282 F.3d 1068, 1072

(9th Cir. 2002), as amended on denial of reh'g and reh'g en banc (Apr. 17, 2002)). Here, Plaintiffs contend, exhaustion is excused "primarily because Plaintiffs' challenge is based on substantial constitutional questions of equal protection and due process" and also because requiring exhaustion would result in irreparable harm to Plaintiffs. *Id.*

Furthermore, the next step in the inquiry under *Mindes* for determining justiciability, which requires the court to weigh four factors, also supports judicial review, Plaintiffs assert. *Id.* In particular, Plaintiffs argue that: 1) the nature and strength of their claims, which involve constitutional violations related to a policy that was found to be unconstitutional before it was repealed and implicates fundamental rights of armed services members, supports judicial review; 2) the harm to Plaintiffs and the putative class, who face "significant potential injuries arising from the explicit references to sexual orientation on their discharge paperwork[,]" FAC ¶¶ 36-41, supports judicial review; and 3) Plaintiffs' requested relief deals only with discharge papers for veterans who are no longer active or reserve members of the military and, therefore, will have no effect on ongoing military functions." *Id.* at 13.

Plaintiffs also reject Defendants' reliance on *TransUnion LLC v. Ramirez*, 141 S. Ct. 2190 (2021) in support of their assertion that Plaintiffs do not have standing to assert a claim based on infringement of their privacy rights because they have not alleged any disclosure of Plaintiffs' private information to a third party. *Id.* at 13-14. According to Plaintiffs, the Court in *TransUnion* found that the plaintiffs did not have standing where they alleged only a statutory violation, namely, violation of the Fair Credit Reporting Act. *Id.* The plaintiffs in that case attempted to establish standing by analogizing their statutory claim to a claim for defamation but the Supreme Court rejected that attempt because defamation requires dissemination of private information to a third party, Plaintiffs contend. *Id.* at 14. Plaintiffs assert, "[t]he Supreme Court's focus on dissemination, which is the basis for Defendants' reliance on *TransUnion* here, arises from its significance in defamation claims—not any freestanding relevance to the Article III standing analysis." *Id.* (citing Motion at 13; *TransUnion*, 141 S. Ct. at 2209 (quoting Restatement of Torts § 577, Comment a, at 192)). Instead, Plaintiffs assert, the Court in *TransUnion* recognized that "reputational harms, disclosure of private information, and intrusion upon seclusion," as well as

14

1   "harms specified by the Constitution itself" constitute concrete harms that *do* give rise to standing.

2   *Id.* at 13-14.  According to Plaintiffs, "[t]he constitutional claims alleged by Plaintiffs in this case

3   are among those specifically contemplated by the Supreme Court in *TransUnion.*"  *Id.*

4        Finally, Plaintiffs argue that they have adequately alleged claims for violation of their

5   rights to equal protection, substantive due process and procedural due process.  *Id.* at 14-25. As to

6   their equal protection claim, Plaintiffs contend Defendants have misunderstood their claim, which

7   challenges the policy adopted in the Stanley Memo rather than the rules governing the military

8   correction board procedures.  *Id.*  at 13-18.  According to Plaintiffs, their allegations are sufficient

9   to raise an inference that Defendants have discriminated against them on an ongoing basis.  *Id.*

10       Plaintiffs also reject Defendants' challenge to their substantive due process claims.  *Id.* at

11  18-19. They contend Defendants do not dispute that Plaintiffs have adequately alleged a property

12  interest based on denial of veterans' benefits, asserted in Claim Three, and therefore the Court

13  should deny the Motion as to Plaintiffs' substantive due process claim pertaining to the

14  deprivation of veterans' benefits.  *Id.* at 18 n. 16. As to Claim Two, they contend they have a

15  constitutionally protected liberty interest in avoiding disclosure of personal matters, pointing to the

16  Ninth Circuit's recognition that "one's sexual orientation is 'inherently sensitive or intimate

17  information' that has 'intrinsic,' rather than mere 'consequential,' harms when disclosed." *Id.* at

18  18-19 (citing *In re Crawford*, 194 F.3d 954, 960 (9th Cir. 1999)).  They further contend the FAC

19  alleges a violation of this constitutional right by alleging that Defendants "published and continue

20  to maintain indicators of Plaintiffs' sexual orientation on Plaintiffs' DD-214s[,]" *id.* (citing FAC

21  ¶¶ 56, 63); that Defendants "know or should have known that veterans must disclose their DD-214

22  to third parties as proof of military service and to obtain numerous federal and state benefits,

23  private benefits, employment opportunities, and myriad other opportunities[,]" *id.* (citing FAC ¶¶

24  16-20, 48, 71-76, 88-93, 134-137); and that "explicit on every veteran's DD-214 is an instruction

25  that 'this is an important record . . . safeguard it.'"  *Id.* (citing FAC ¶ 35).

26       According to Plaintiffs, Defendants are incorrect in characterizing Plaintiff Farrell's

27  disclosure of her DD-214, and thus, her disclosure of her sexual orientation, to her employer as

28  voluntary.  *Id.* at 19.  Plaintiffs point out that they expressly allege that Farrell was "required" to

United States District Court
Northern District of California

15

disclose her DD-214 and that she "did not have the choice other applicants had of whether or when to disclose her sexual orientation to her employer." *Id.* (quoting FAC ¶ 75). With respect to the remaining four Plaintiffs, as to whom Defendants assert there was no disclosure alleged, Plaintiffs point to allegations in the FAC that these plaintiffs did, in fact, disclose their DD-214s to third parties. *Id.* at 19 n. 18 (citing FAC ¶¶ 75, 88, 92).

Plaintiffs analogize their DD-214s to passports, which "enable the holder to travel internationally." *Id.* at 19-20. According to Plaintiffs, "[t]raveling abroad (like applying for a job) may be voluntary, but it is preposterous to imagine that the Government could require disclosure of a citizen's sexual orientation on a passport if they chose to apply for one and then use it to travel." *Id.* at 20. Plaintiffs argue that an individual's disclosure under such circumstances is the "functional equivalent" of a disclosure of their confidential information by the government, which can be the basis for a constitutional claim based on informational privacy. *Id.* (citing *Am. Fed'n of Gov't Emps. v. Office of Pers.Mgmt. (In re United States OPM Data Sec. Breach Litig.),* 928 F.3d 42 (D.C. Cir. 2019).

Plaintiffs further assert that the alleged conduct rises to the level of a constitutional violation, arguing that the "shocks the conscience" standard upon which Defendants rely applies only to executive action whereas the policy adopted in the Stanley Memo that is the subject of Plaintiffs' substantive due process claims is a quasi-legislative act that is subject to "traditional levels of scrutiny." *Id.* at 20-21. According to Plaintiffs, Defendants cannot survive even the lowest level of scrutiny (rational basis) because "Defendants do not have, and do not assert, any government interest— legitimate, important, or otherwise—in continuing to discriminate against LGBTQ+ veterans." *Id.* at 21-22. Even if the "shocks the conscience" standard applies, Plaintiffs contend, their allegations are sufficient to meet that standard. *Id.* at 21.

Plaintiffs argue that their procedural due process claim is sufficiently pled because they have alleged deprivation of constitutionally protected liberty and property interests, as discussed above, and have also alleged facts sufficient to establish that the procedural process offered to them is constitutionally inadequate under *Mathews v. Eldridge*, 424 U.S. 319, 335 (1976). *Id.* at 22-25. They distinguish cases cited by Defendants to argue that where the state has put into place

16

a procedure to address the plaintiff's specific grievances, there is no due process violation, on the basis that "[u]nlike those cases, the military's Record Correction Process was never designed to address the systematic revision of discriminatory information on Plaintiffs' DD-214s[,]" and that "[b]urdensome procedures cannot be 'fair' or 'reasonable' if there is no justification for their existence." *Id.* at 24.

### 3. Reply

In their Reply, Defendants reiterate the arguments in the Motion, asserting that their arguments are supported by "the overwhelming weight of authority" whereas Plaintiffs "provide no examples of another court adopting their theories in similar circumstances." Reply at 1. They again contend that the Court's dismissal of Plaintiffs' claims will not leave Plaintiffs without a remedy as they may apply to have their discharge paperwork corrected under existing procedures. *Id.* They point out that one of the named plaintiffs, Hayden Powell, applied for and was granted such relief on December 20, 2023 (after the Motion and Opposition were filed), arguing that her claim is now moot. Reply at 1.[2]

Defendants reject Plaintiffs' reliance on the continuing violation doctrine to establish that their claims are timely. *Id.* at 2-3. They argue that the DADT statute and implementing regulations have not been enforced for over twelve years, as the Ninth Circuit recognized in *Log Cabin Republicans v. United States*, 658 F.3d 1162 (9th Cir. 2011), and therefore, this case does not involve the ongoing enforcement of an unconstitutional statute or new injuries associated with that enforcement. *Id.* at 2. Nor does the fact that this case is a class action allow Plaintiffs to avoid the statute of limitations, Defendants assert. *Id.* at 2 (citing *Walters v. Sec'y of Def.*, 725 F.2d 107 (D.C. Cir. 1983)). Further, they contend, in the case cited by Plaintiffs, *Bird v. Dep't of Hum. Servs.*, 935 F.3d 738 (9th Cir. 2019), the court expressly recognized that "class-wide pattern-or-practice claims cannot 'rescue individualized claims that are otherwise time-barred.'" *Id.* at 3 (quoting *Bird*, 935 F.3d at 748). Defendants also reject Plaintiffs' argument that they are excused

---

[2] At the motion hearing, Plaintiffs did not concede that Powell's claims are moot, asserting that the decision of the military correction board did not afford complete relief to Powell. As this issue was not fully briefed, the Court declines to decide whether Powell's claims are moot.

United States District Court
Northern District of California

from the statute of limitations because they seek only prospective relief. *Id.* According to Defendants, there is no exception. *Id.* (quoting *Kendall*, 996 F.2d at 366 ("28 U.S.C. § 2401(a) . . . applies to all civil actions whether legal, equitable, or mixed.")). Defendants assert that Plaintiffs' reliance on *Flynt v. Shimazu*, 940 F.3d 457 (9th Cir. 2019) to support their position is misplaced because that case "merely stands for the unremarkable proposition that a plaintiff may seek to enjoin a statute that is actively being enforced against them." *Id.* (citing *Flynt*, 940 F.3d at 463).

Defendants argue that because DADT was repealed over twelve years ago and is no longer being enforced, the ongoing injuries Plaintiffs complain of are not the result of new violations but instead, the "continuing impact resulting from the prior enforcement of those defunct statutes and policies." *Id.* Such continuing impact, however, does not support application of the continuing violation doctrine, Defendants contend. *Id.* (citing *Knox v. Davis*, 260 F.3d 1009, 1013 (9th Cir. 2001);  *Garcia v. Brockway*, 526 F.3d 456, 462 (9th Cir. 2008)).

Defendants further assert that the doctrine of equitable tolling should not be applied. *Id.* at 4-5.  According to Defendants, "[e]quitable tolling is appropriate 'only in rare instances where—due to circumstances external to the party's own conduct—it would be unconscionable to enforce the limitation period against the party and gross injustice would result.'" *Id.* at 4 (quoting *Jackson v. Modly*, 949 F.3d 763, 778 (D.C. 2020) (citation omitted)).  That standard is not met here, Defendants assert, "as Plaintiffs and the members of the putative class may still seek relief through a Service correction board [ ] [a]nd if the military does not provide them relief, they may then challenge that decision in federal court." *Id.*

Defendants contend "Plaintiffs merely repeat the same allegations regarding the purported difficulty of correction board proceedings[,]" "[b]ut these procedures apply to all service members who seek a correction of their military records." *Id.* at 4.  Defendants argue that Plaintiffs' position should be rejected because "[a]llowing decades of equitable tolling in this circumstance would in effect void the statute of limitations with respect to challenges to a military discharge or a military correction board action." *Id.* at 4-5 (citing *In re Navy Chaplaincy*, No. 07-269 (JDB), 2023 WL 5428666, at *9 (D.D.C. Aug. 23, 2023), appeal filed, No. 23-5283 (D.C. Cir. Nov. 29, 2023); *Avery v. Dep't of the Army*, No. 14-cv-01077-YGR, 2015 WL 4451591 (N.D. Cal. July 20,

18

1    2015); *Paddock v. U.S. Air Force*, No. 2:19-CV-36-RMP, 2019 WL 6039965, at *4 (E.D. Wash.

2    Nov. 14, 2019); *Mosley v. United States Dep't of Army*, No. CV-13-02645-PHX-SRB, 2014 WL

3    12693819, at *4 (D. Ariz. May 12, 2014), aff'd sub nom. *Mosley v. United States*, 668 F. App'x

4    724 (9th Cir. 2016)).

5           Defendants reject Plaintiffs' 12(b)(6) arguments. As to the equal protection claim,

6    Defendants assert in their Reply that Plaintiffs have "reframed" the theory of their claim to focus

7    on the Stanley Memo as the challenged conduct.  Reply at 8.  They argue, for the first time, that

8    Plaintiffs' "novel theory" still fails because: 1) "Plaintiffs provide no example where a court found

9    that Government inaction provided the basis for an equal protection claim[;]" and 2) "The fact that

10   the military uses the same correction board process for those that were discharged pursuant to

11   DADT policies as it uses for any other service member's request to correct their military records

12   cannot reasonably be interpreted to be discriminatory" and Plaintiffs have not "plausibly alleged

13   that the correction board process has a pattern of disparate outcomes from which unconstitutional

14   discriminatory intent could be inferred." *Id.* at 8-9.   As to the latter point, Defendants reiterate that

15   83.5% of veterans who were discharged pursuant to DADT policies and who have applied for

16   relief from a military correction board have received such relief.  *Id.* at 9.

17          Likewise, Defendants assert, Plaintiffs' "reframing" of their claims does not save their

18   procedural due process claim.  *Id.* at 9-10.  In particular, they contend, Plaintiffs have not shown

19   that the current process available to them is unfair and to the extent they want Defendants to

20   conduct a systematic review, the due process clause does not guarantee "a record correction

21   process which meets Plaintiffs' exact specifications." *Id.* (citing *Goss v. Lopez*, 419 U.S. 565, 579

22   (1975); *Cleveland Bd. of Educ. v. Loudermill*, 470 U.S. 532, 547 (1985)).

23          Finally, Defendants reiterate their argument that Plaintiffs fail to state a claim for violation

24   of their right to substantive due process.  *Id.* at 10-11.  First, they reject Plaintiffs' assertion that

25   Defendants have not challenged their claim based on denial of benefits (Claim Three), arguing

26   (like Plaintiffs, in a footnote) that they addressed their challenges in the context of their statute of

27   limitations argument and also asserting that "Plaintiffs themselves recognize in their Amended

28   Complaint, *see, e.g.*, FAC ¶¶ 46-49, that Defendants do not administer these programs."  *Id.* at 10

United States District Court
Northern District of California

n. 6. Defendants further assert that "Plaintiffs cite no case where heightened scrutiny was applied to a claim of Government inaction or where Government inaction was determined to serve as the basis for a substantive due process claim." *Id.* at 11.  According to Defendants, "the Supreme Court has only found Government inaction to rise to the level of a substantive due process violation in the most extreme circumstances, such as the deliberate indifference to the medical needs of a detainee." *Id.* (citing *Cnty. of Sacramento v. Lewis*, 523 U.S. 833, 836 (1998); *Porter v. Osborn*, 546 F.3d 1131, 1137 (9th Cir. 2008)).  The existing military correction board process available to Plaintiffs here does not meet that standard, Defendants contend.  *Id.* Defendants again cite to the statistic that 83.5% of veterans discharged based on sexual orientation who have applied for correction have contained the requested relief.  *Id.*

## III.   ANALYSIS

In the Motion, Defendants focus heavily upon questions of timeliness, exhaustion and standing, while addressing the question of whether Plaintiffs have stated viable claims in a more cursory manner, almost as an afterthought.  The Court finds that an understanding of the legal theories that underpin Plaintiffs' claims is important for addressing the thorny questions raised in the Motion relating to application of equitable tolling and the continuing violation doctrine, among other things.  Therefore, the Court will begin its analysis by considering the arguments raised at the end of Defendants' Motion, challenging the viability of Plaintiffs' claims, and then will address their challenges based on timelines, standing and exhaustion of remedies.

### A.   Legal Standards

Defendants seek dismissal of Plaintiffs' claims under Rule 12(b)(1) and 12(b)(6) of the Federal Rules of Civil Procedure. Under Rule 12(b)(1), a party may move to dismiss a claim based on lack of subject matter jurisdiction, including the absence of standing and failure to exhaust administrative remedies. *Chandler v. State Farm Mut. Auto. Ins. Co.*, 598 F.3d 1115, 1123 (9th Cir. 2010) (standing); *Benson v. JPMorgan Chase Bank, N.A.*, 673 F.3d 1207, 1211 (9th Cir. 2012) (exhaustion).  Statute of limitations challenges based on 28 U.S.C. § 2401(a) are governed by Rule 12(b)(6), *see Cedars-Sinai Med. Ctr. v. Shalala*, 125 F.3d 765, 770 (9th Cir. 1997), as are Defendants' assertion that Plaintiffs fail to allege sufficient facts to state a claim.

A party challenging the court's subject matter jurisdiction under Rule 12(b)(1) may bring a facial challenge or a factual challenge.  *See White v. Lee*, 227 F.3d 1214, 1242 (9th Cir. 2000).  "'In deciding a Rule 12(b)(1) facial attack motion, a court must assume the facts alleged in the complaint to be true and construe them in the light most favorable to the nonmoving party.'" *Torrey Pines Logic, Inc. v. Gunwerks, LLC*, No. 19-CV-02195-H-JLB, 2020 WL 6106814, at *4 (S.D. Cal. July 14, 2020) (quoting *Strojnik v. Kapalua Land Co. Ltd.*, 379 F. Supp. 3d 1078, 1082 (D. Haw. 2019) (citing *Warren v. Fox Family Worldwide, Inc.*, 328 F.3d 1136, 1139 (9th Cir. 2003))).  Here, Defendants' 12(b)(1) challenges to subject matter jurisdiction are facial.  Consequently, the standard that applies to those challenges is essentially the same as the one that applies to their Rule 12(b)(6) challenges.

A complaint may be dismissed under Rule 12(b)(6) of the Federal Rules of Civil Procedure for failure to state a claim on which relief can be granted.  "The purpose of a motion to dismiss under Rule 12(b)(6) is to test the legal sufficiency of the complaint." *N. Star Int'l v. Ariz. Corp. Comm'n*, 720 F.2d 578, 581 (9th Cir. 1983).  Generally, a plaintiff's burden at the pleading stage is relatively light.  Rule 8(a) of the Federal Rules of Civil Procedure states that a "pleading which sets forth a claim for relief . . . shall contain . . . a short and plain statement of the claim showing that the pleader is entitled to relief."  Fed. R. Civ. P. 8(a).

In ruling on a motion to dismiss under Rule 12(b)(6), the court analyzes the complaint and takes "all allegations of material fact as true and construe[s] them in the light most favorable to the non-moving party." *Parks Sch. of Bus. v. Symington*, 51 F.3d 1480, 1484 (9th Cir. 1995).  A complaint must "contain either direct or inferential allegations respecting all the material elements necessary to sustain recovery under some viable legal theory." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 562 (2007) (citing *Car Carriers, Inc. v. Ford Motor Co.*, 745 F.2d 1101, 1106 (7th Cir. 1984)).  "A pleading that offers 'labels and conclusions' or 'a formulaic recitation of the elements of a cause of action will not do.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Twombly*, 550 U.S. at 555).  Rather, the claim must be "'plausible on its face,'" meaning that the plaintiff must plead sufficient factual allegations to "allow[] the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.* (quoting *Twombly*, 550 U.S. at 570).

Generally, the Court may not consider material outside the pleadings in ruling on a motion to dismiss for failure to state a claim. *Branch v. Tunnell*, 14 F.3d 449, 453–54 (9th Cir. 1994), overruled on other grounds by *Galbraith v. County of Santa Clara*, 307 F.3d 1119 (9th Cir. 2002). Under the "incorporation by reference" doctrine, however, "documents whose contents are alleged in a complaint and whose authenticity no party questions, but which are not physically attached to the pleading, may be considered in ruling on a Rule 12(b)(6) motion to dismiss." *Id*. at 454. "Unlike rule-established judicial notice, incorporation-by-reference is a judicially created doctrine that treats certain documents as though they are part of the complaint itself." *Khoja v. Orexigen Therapeutics, Inc*., 899 F.3d 988, 1002 (9th Cir. 2018). "The doctrine prevents plaintiffs from selecting only portions of documents that support their claims, while omitting portions of those very documents that weaken—or doom—their claims." *Id*.

### B.  Whether Plaintiffs' Claims Should be Dismissed for Failure to State a Claim under Rule 12(b)(6)

#### 1.  Equal Protection Claim

Defendants contend Plaintiffs cannot state a claim for violation of their right to equal protection based on the military correction board procedures they are required to follow to obtain corrected discharge paperwork because these procedures are facially neutral and Plaintiffs have not alleged (and cannot plausibly allege) that the procedures were implemented with discriminatory intent. Motion at 13-16. In their Reply, Defendants also assert Plaintiffs' equal protection claim fails because it is based on government inaction and courts have rejected equal protection claims based on the government's failure to act. The Court disagrees with both arguments.

The Fifth Amendment to the Constitution provides that "No person shall . . . be deprived of life, liberty, or property, without due process of law."  Although the words "equal protection" do not appear in the Fifth Amendment's text, the Fifth Amendment's Due Process Clause includes an equal protection component and "[e]qual protection analysis in the Fifth Amendment area is the same as that under the Fourteenth Amendment." *Buckley v. Valeo*, 424 U.S. 1, 93, 96 (1976). "The Equal Protection Clause requires the State to treat all similarly situated people equally." *Shakur v.*

*Schriro*, 514 F.3d 878, 891 (9th Cir. 2008) (citation omitted). To state a claim for a violation of the Equal Protection Clause, "a plaintiff must show that the defendants acted with an intent or purpose to discriminate against the plaintiff based upon membership in a protected class[,]" *Barren v. Harrington*, 152 F.3d 1193, 1194 (9th Cir. 1998), "or that similarly situated individuals were intentionally treated differently without a rational relationship to a legitimate state purpose." *Jackson v. California*, No. 1:13-CV-01055-LJO, 2014 WL 3778263, at *5 (E.D. Cal. July 30, 2014), report and recommendation adopted, No. 1:13-CV-01055-LJO-SA, 2014 WL 4192802 (E.D. Cal. Aug. 20, 2014) (citing *Thornton v. City of St. Helens*, 425 F.3d 1158, 1167 (2005); *Village of Willowbrook v. Olech*, 528 U.S. 562, 564 (2000)).

An equal protection violation may be established based on either a law or policy that is discriminatory on its face or on a facially neutral law or policy that results in a disproportionate impact and is motivated by a racially discriminatory purpose. *Adarand Constructors, Inc. v. Pena*, 515 U.S. 200, 213, 227-29, (1995) (citing *Arlington Heights v. Metropolitan Housing Development Corp.*, 429 U.S. 252 (1977); *Washington v. Davis*, 426 U.S. 229 (1976)). Defendants focus on the fact that the rules and procedures governing the records correction process are facially neutral and apply to all requests for correction of discharge paperwork, but Plaintiffs' equal protection claim is based on Defendants' affirmative decision to leave the discharge paperwork of veterans discharged under DADT and predecessor policies unchanged and place the burden on veterans who were discharged on the basis of sexual orientation to seek a correction of their paperwork. The Court finds that that policy is not facially neutral and Plaintiffs have adequately alleged that it was motivated by discriminatory intent.

First, Plaintiffs have pointed to the Stanley Memo, which contains specific language that gives rise to a plausible inference of discriminatory intent, at least at the pleading stage of the case. In particular, the Stanley Memo found that systematic correction of the discharge paperwork at issue was "not warranted" and that while "DADT's repeal may be a relevant factor in evaluating an application . . . the issuance of a discharge under DADT or the taking of an action pursuant to DoD regulations related to a discharge under DADT should not by itself be considered to constitute an error or injustice that would invalidate an otherwise proper action taken pursuant to

1    DADT and applicable DoD policy."  Stanley Memo at 2.

2         Second, Plaintiffs allege facts establishing that Defendants are aware  of the importance of

3    the DD-214 for obtaining benefits and that any veteran who seeks such benefits – including those

4    whose sexual orientation is listed on their paperwork – will be required to disclose the paperwork

5    to third parties in order to receive benefits but that Defendants have declined to initiate a

6    systematic review to correct these records even though they have the legal authority to do so.  *See*

7    FAC ¶¶ 7-11, 23-25.  These allegations raise a plausible inference of discriminatory intent.

8         Finally, Plaintiffs have alleged facts supporting an inference that Defendants' decision to

9    require that they individually apply to remove indicators of their sexual orientation creates a

10   disparate impact on them.  In particular, Plaintiffs allege that only veterans discharged under

11   DADT and predecessor policies must go through a stigmatizing, traumatic and burdensome

12   "correction" process to ensure that their discharge paperwork does not disclose their sexual

13   orientation because they are the only veterans whose sexual orientation is listed on their discharge

14   paperwork in the first instance.  *See, e.g.,* FAC ¶¶ 7, 11, 41, 67, 100-103, 106-110, 127, 130-131.[3]

15        The Court also rejects Defendants' assertion that Plaintiffs cannot state an equal protection

16   claim based on government inaction.  While Defendants cite a handful of cases in which courts

17   have found that government inaction does not give rise to an equal protection violation, *see* Reply

18   at 9 (citing *M.S. v. Brown*, 902 F.3d 1076, 1087 (9th Cir. 2018); *Juliana v. United States*, 947 F.3d

19   1159, 1175 (9th Cir. 2020) and *LA All. for Hum. Rts. v. Cnty. of L.A.*, 14 F.4th 947 (9th Cir.

20   2021)), the facts here are distinguishable because Plaintiffs challenge affirmative conduct, namely,

21   a policy decision by Defendants to handle their discharge paperwork in a particular manner and a

22

---

23   [3] Defendants argue in the Motion and reiterate in their Reply that 83.5% of veterans who were
     discharged pursuant to DADT policies and who have applied to a military correction board for

24   relief have received such relief.  Motion at 10; Reply at 9.  On a Rule 12(b)(6) challenge, however,
     introduction of evidence to controvert the allegations in the complaint is improper.  Even if the

25   Court were to consider this statistic, it merely reinforces Plaintiffs' allegations as it is based on a
     total of *1,683* requests for relief, of which 1,406 had been granted as of March 2023.  *See id.*

26   (emphasis added).  Given that Plaintiffs have alleged that "between October 1, 1980, and
     September 20, 2011, *35,801* veterans received a discharge or separation from service 'because of

27   real or perceived homosexuality, homosexual conduct, sexual perversion, or any other related
     reason[,]' " FAC ¶ 33 (emphasis added), it is fair to say that only a "relative handful[,]" FAC ¶ 55,

28   of former members discharged under DADT and similar predecessor policies have applied to have
     their discharge paperwork corrected.

United States District Court
Northern District of California

finding that a systematic review and correction process, even though authorized by law, was not warranted.

Therefore, the Court finds that Plaintiffs have adequately pled an equal protection claim.

### 2. Substantive Due Process

Substantive due process protects against the arbitrary or oppressive exercise of governmental power. *See County of Sacramento v. Lewis*, 523 U.S. 833, 845-46 (1998). "[A] substantive due process claim 'must, as a threshold matter, show a government deprivation of life, liberty, or property.' " *Action Apartment Ass'n, Inc. v. Santa Monica Rent Control Bd*., 509 F.3d 1020, 1026 (9th Cir. 2007) (quoting *Nunez v. City of Los Angeles*, 147 F.3d 867, 871 (9th Cir. 1998)). Here, Plaintiffs bring two substantive due process claims: one based on alleged invasion of their informational privacy (Claim Two) and the other based on deprivation of benefits (Claim Three). The Court finds that Plaintiffs have alleged sufficient facts to state a claim as to both.

#### a. Substantive Due Process Claim Based on Informational Privacy

Defendants acknowledge that the Ninth Circuit has "recognizes a 'right to informational privacy' stemming from 'the individual interest in avoiding disclosure of personal matters.' " Motion at 17 (quoting *In re Crawford*, 194 F.3d 954, 958 (9th Cir. 1999) (quoting *Doe v. Attorney General*, 941 F.2d 780, 795 (9th Cir. 1991))). Furthermore, in *In re Crawford*, the Ninth Circuit recognized that information about sexual orientation is "inherently sensitive or intimate information." *Id.* at 960. Defendants contend, however, that Plaintiffs have failed to state a substantive due process claim based on violation of the right to informational privacy because they have not alleged that there has been an unauthorized disclosure or public dissemination of private material by Defendants. *Id.* Because the cases upon which Defendants rely are factually distinguishable, the Court finds that they do not establish, as a matter of law, that Plaintiffs have not sufficiently alleged that their right to informational privacy has been violated.

First, Defendants point to *Endy v. City of L.A.*, citing the court's holding in that case that "Endy's constitutional privacy claim fails under both state and federal law because he provides no evidence that his information has been publicly disseminated or disclosed." 975 F.3d 757, 769 (9th Cir. 2020). But the facts are distinguishable in that case. There, the court found that mere

inclusion of the plaintiff's private information in a child welfare database did not give rise to a constitutional violation of his right to informational privacy because that information had not been publicly disseminated.  975 F.3d at 769.  Here, the issue is different.  Plaintiffs have alleged that they *must* disclose the information on their DD-214s to access benefits and that because Defendants issued this documentation for that very purpose, the policy of leaving it uncorrected (absent an application by the service member to have it changed) is the functional equivalent of affirmatively disclosing Plaintiffs' private information.  That is a scenario the court in *Endy* simply did not address.

Similarly, Defendants' reliance on *AFGE v. OPM (In re United States OPM Data Sec. Breach Litig.)*, 928 F.3d 42, 72-73 (D.C. Cir. 2019) is misplaced.  In that case, the court stated that "Plaintiffs have identified no case in which the government has been held to have violated the alleged right without having affirmatively provided the protected information to those unauthorized to view it." But that case also involved a very different set of facts.  In particular, the plaintiffs' private information in *AFGE* was alleged to have been obtained by cyberhackers and the plaintiffs sought to hold the Office of Personnel Management liable for a constitutional infringement on their privacy interests based on its alleged "reckless" failure to prevent a third party from stealing it.  *Id.* at 72.  The court thus "declin[ed] to recognize the proposed constitutional right to informational privacy that would be violated . . . when a third party *steals* it."  *Id.* (citation and quotation omitted) (emphasis in original).

But the court in *AFGE* implicitly recognized that a plaintiff's right to informational privacy would be violated "when information is intentionally disclosed (*or the functional equivalent*)[.]" *Id.* (emphasis added).  Here, Plaintiff's theory is that Defendants' refusal to undertake a comprehensive review of discharge paperwork issued to service members discharged under DADT and similar predecessor policies is the "functional equivalent" of an intentional disclosure of Plaintiffs' private information because Defendants issued Plaintiffs' discharge paperwork with the understanding and express intent that former service members would use this paperwork to access a range of benefits.  Defendants have pointed to no authority that establishes *as a matter of law*, that Plaintiffs cannot state a claim based on this theory.  Therefore, the Court rejects

26

1    Defendants' Rule 12(b)(6) challenge on this ground.

2                    b.   "Shocks the Conscience" vs. Levels of Scrutiny

3            Defendants argue that both of Plaintiffs' substantive due process claims fail because they

4    have not alleged executive action that "shocks the conscience."  The Court finds that this is not the

5    correct standard and that even if it were, Plaintiffs' allegations are sufficient to meet that standard.

6            In *County of Sacramento v. Lewis*, the Supreme Court explained that "criteria to identify

7    what is fatally arbitrary differ depending on whether it is legislation or a specific act of a

8    governmental officer that is at issue," 523 U.S. 833, 847 n.8, 850.  For "executive acts," the

9    substantive component of the Due Process Clause is violated only when it "can properly be

10   characterized as arbitrary, or conscience shocking, in a constitutional sense." *Id.* at 847 (quoting

11   *Collins v. City of Harker Heights, Tex*., 503 U.S. 115, 128 (1992)).  "For legislative or quasi-

12   legislative acts, a court should apply the more traditional levels of scrutiny (such as rational basis

13   review, heightened or intermediate review, or strict scrutiny) based on the specific right asserted."

14   *Hunter v. United States Dep't of Educ*., 650 F. Supp. 3d 1104, 1126 (D. Or. 2023) (citation

15   omitted);  *see also Jiahao Kuang v. United States Dep't of Def*., 340 F. Supp. 3d 873, 903 n. 17

16   (N.D. Cal. 2018), order clarified sub nom. *Kuang v. United States Dep't of Def*., No. 18-CV-

17   03698-JST, 2019 WL 718632 (N.D. Cal. Feb. 20, 2019), and vacated and remanded on other

18   grounds, 778 F. App'x 418 (9th Cir. 2019) (rejecting DoD's argument that substantive due process

19   claim by service member who was a lawful permanent resident challenging policy that required

20   completed, rather than pending, background investigations before LPR service members could

21   begin basic training was subject to "shocks the conscience" standard).

22           Here, Plaintiffs challenge the policy adopted in the Stanley Memo rather than any

23   particular executive action, such as the outcome of a particular proceeding brought before a

24   service board for correction of records.  As a consequence, traditional levels of scrutiny apply –

25   though Court does not decide at this time what level of scrutiny applies to Plaintiffs' substantive

26   due process claims.

27           Even if Defendants were correct that Plaintiffs must allege conduct that shocks the

28   conscience, the Court finds that the allegations in the FAC are sufficient to survive the pleading

United States District Court
Northern District of California

stage.  The Supreme Court has recognized that what shocks the conscience depends on the specific circumstances of the state's action.  *Cnty. of Sacramento v. Lewis*, 523 U.S.  at 850 ("Deliberate indifference that shocks in one environment may not be so patently egregious in another, and our concern with preserving the constitutional proportions of substantive due process demands an exact analysis of circumstances before any abuse of power is condemned as conscience shocking.").  Plaintiffs have alleged facts that raise a plausible inference of conduct that shocks the conscience.

As discussed above, Plaintiffs have included extensive allegations in the FAC about the trauma inflicted on them by the approach Defendants have chosen to take to handling the sexual orientation information (and sometimes associated dishonorable discharge information) reflected on their discharge paperwork.  This policy places the onus on these former service members to justify the removal from their DD-214s of information about their sexual orientation, which the Ninth Circuit has found to be sensitive and private information, as discussed above.  It also requires them to go through a process that Plaintiffs allege is lengthy and burdensome, even sometimes requiring them to obtain "statements from their military supervisors (who may have participated in the discrimination) [and] letters of support from colleagues and friends (to whom the applicant must disclose the trauma of their discharge)." FAC ¶ 106. They have further alleged that DoD has recognized this paperwork is a crucial for establishing entitlement to veterans' benefits, both public and private, and must be disclosed to obtain those benefits but nonetheless found there was no "injustice" associated with leaving service members with uncorrected paperwork and no need to undertake broad remedial action to remedy this situation.

While the Court "recognizes the 'presumption that the administration of government programs' and '[d]ecisions concerning the allocation of resources' are 'based on a rational decisionmaking process that takes account of competing social, political, and economic forces[,]' " *Fraternal Ord. of Police Dep't of Corr. Lab. Comm. v. Williams*, 375 F.3d 1141, 1145 (D.C. Cir. 2004) (quoting *Collins v. City of Harker Heights, Tex.*, 503 U.S. 115, 128 (1992)), the allegations here are sufficient to raise a plausible inference that Defendants' "conduct [was] intended to injure in some way unjustifiable by any government interest[,]" *see id.*, namely, to perpetuate the

28

discrimination against Plaintiffs' based on their sexual orientation or perceived sexual orientation even after they were wrongfully discharged from the armed services on that basis.  Thus, at least as a matter of pleading, these allegations are sufficient to allege conduct that shocks the conscience.

Therefore, the Court finds Plaintiffs state viable claims for violation of their rights to substantive due process.

### 3.  Procedural Due Process

Plaintiffs' procedural due process claim is premised on the theory that the military correction board procedures that Plaintiffs must follow in order to obtain discharge paperwork that does not disclose their personal information relating to sexual orientation and, where applicable, to upgrade their discharge status, are constitutionally inadequate because of the burdens and trauma they impose on veterans who have already been traumatized by their unconstitutional discharge. While Defendants argue that this claim should be dismissed because Plaintiffs are not entitled to the exact process they seek, they have not cited any cases that suggest that Plaintiffs' claim is deficient as a matter of law.  Therefore, the Court rejects this argument.

### C.    Whether Plaintiffs' Claims Should be Dismissed for Lack of Standing or Failure to Exhaust

Defendants contend Plaintiffs lack standing to challenge military correction board procedures because only one Plaintiff (Hayden Powell) has applied to have her records corrected and none has applied and had their application denied under those procedures.  Similarly, they assert, Plaintiffs cannot challenge administrative correction board procedures because they have not exhausted their administrative remedies under those procedures.  Defendants also assert Plaintiffs lack standing to assert an informational privacy claim under *TransUnion*.  The Court rejects Defendants' arguments.

### 1.  Legal Standards Governing Article III Standing

Article III standing requires an "injury in fact" that is (1) "concrete and particularized" and "actual or imminent," (2) "fairly traceable to the challenged conduct of the defendant," and (3) "likely to be redressed by a favorable judicial decision." *Spokeo, Inc. v. Robins*, 578 U.S. 330,

United States District Court
Northern District of California

338-39 (2016), as revised (May 24, 2016). "[A] plaintiff must demonstrate standing separately for each form of relief sought." *Friends of the Earth, Inc. v. Laidlaw Env't Servs. (TOC), Inc*., 528 U.S. 167, 185 (2000).

### 2. Military Correction Board Procedures

#### a. Article III Standing

Although Defendants accurately set forth the general principles that govern Article III standing, the case authority they have offered to link those general principles to the facts here is scant. The only case Defendants cite that has anything to do with military correction board procedures, *Nichols v. Hughes*, 721 F.2d 657, 660 (9th Cir. 1983), is not particularly helpful. In that case, the plaintiff had been discharged from the Navy in 1957 for "homosexual acts." 721 F.2d at 658. In 1957 and 1958, the plaintiff "pursued military administrative remedies in an attempt to upgrade his discharge so he would be entitled to educational and other benefits." *Id.* These efforts were unsuccessful, but a subsequent plea to the Board for Correction of Naval Records ("BCNR") in 1975 led to an upgrade to a "general discharge by reason of misconduct" in approximately February 1977. *Id.* at 659. In October 1979, the plaintiff filed an action in federal district court asserting constitutional claims based on the conduct of various naval officers leading up to his discharge. *Id.*

Addressing the timeliness of the plaintiff's claims, the court in *Nichols* found that those claims accrued when plaintiff was discharged, in 1957 – not in 1977, when the BCNR recommendation was issued. *Id.* at 660. The court reasoned that the plaintiff "[did] not challenge the BCNR decision upgrading the status of his discharge as arbitrary or capricious. To the extent he challenge[d] the BCNR decision for failing to order his reinstatement, his challenge is precluded since he failed to ask for that relief in his petition to the BCNR." *Id.* Defendants here rely on this language in support of their standing argument and observe (correctly) that "[c]ourts have long recognized that a challenge to an action taken by a military correction board is separate and distinct from the underlying discharge." Motion at 11 (citing *Rempfer*, 538 F. Supp. 2d at 206-07; *Mosley*, 668 F. App'x at 724). The court did not, however, address the basis for its holding, or frame it as a question of Article III standing.

Even assuming that the decision in *Nichols* was based on Article III standing, however, the case is not on point as the language Defendants cite does not fit the theory of Plaintiffs' claims. As discussed above, Plaintiffs here do not challenge any particular action or decision of a military correction board.  Instead, they challenge the policy adopted by Defendants in 2011 of requiring veterans discharged under unconstitutional past policies, including DADT, to utilize the procedures established to address incorrect information in their discharge paperwork in order to obtain updated paperwork that does not state their sexual orientation and removes any dishonorable discharge associated with their sexual orientation.  *Nichols* does not shed light on the question of whether Plaintiffs have standing to pursue that claim.

Defendants also quote *Clapper v. Amnesty Int'l USA*, in which the Supreme Court explained that "[t]he law of Article III standing, which is built on separation-of-powers principles, serves to prevent the judicial process from being used to usurp the powers of the political branches." Motion at 11 (quoting 568 U.S. 398, 408 (2013)).  This general statement, however, does not answer the question of whether Plaintiffs have standing, under the test articulated in *Spokeo* and other Supreme Court authority, to challenge the process Defendants have decided Plaintiffs must go through to remove their sexual orientation from their discharge paperwork and upgrade their discharge status.

To counter Defendants' thinly supported standing argument, Plaintiffs point to a line of cases holding that under some circumstances, a plaintiff may have standing to challenge to a process that is unfair without having to go through that unfair process on the basis that the plaintiff is "able and ready" to apply and therefore, faces "imminent injury." *See* Opposition at 9 (citing *Gratz v. Bollinger*, 539 U.S. 244, 261-62 (2003); *Ne. Fla. Chapter of Associated Gen. Contractors of Am. v. City of Jacksonville, Fla*., 508 U.S. 656, 666 (1993) ("*Ne. Fla. Chapter of Associated Gen. Contractors of Am.*"); *Planned Parenthood of Greater Washington & N. Idaho v. U.S. Dep't of Health & Hum. Servs*., 946 F.3d 1100, 1108 (9th Cir. 2020) ("*Planned Parenthood*")).  In *City of Jacksonville,* the Court explained that in the context of equal protection challenges, the following principal applies:

When the government erects a barrier that makes it more difficult for

> members of one group to obtain a benefit than it is for members of another group, a member of the former group seeking to challenge the barrier need not allege that he would have obtained the benefit but for the barrier in order to establish standing. The "injury in fact" in an equal protection case of this variety is the denial of equal treatment resulting from the imposition of the barrier, not the ultimate inability to obtain the benefit.

508 U.S. at 666.

This line of cases is not limited to equal protection challenges, however.  For example, in *Planned Parenthood,* a group of Planned Parenthood organizations "sued the Department of Health and Human Services ['HHS'], alleging that HHS's 2018 Funding Opportunity Announcements ['FOAs'] for funding programs to combat teen pregnancy were contrary to the law as required in their appropriation, the Teen Pregnancy Prevention Program ['TPPP'], which [was] the relevant part of the 2018 Consolidated Appropriations Act."  946 F.3d at 1105.

The Court in *Planned Parenthood* found that the plaintiffs had standing to bring the challenge, even though they had not applied for funding under the 2018 FOA, under the doctrine of "competitor standing[,]" explaining that under that doctrine, " 'the inability to compete on an equal footing in [a] bidding process' is sufficient to establish injury-in-fact."  *Id.* at 1108 (citing *Ne. Fla. Chapter of Associated Gen. Contractors of Am.*, 508 U.S. at 666).  Thus, "[a]n agency action that increases competition tilts the playing field for parties that were already competing, and those parties suffer an injury-in-fact[ ]" so long as they can demonstrate that they were "able and ready to bid."  *Id.* (citing *Ne. Fla. Chapter of Associated Gen. Contractors of Am.,* 508 U.S. at 666; *Gratz*, 539 U.S. at 261–62;  *Carroll v. Nakatani*, 342 F.3d 934, 942 (9th Cir. 2003)). The Court explained further,

> The key is that the injury is the increase in competition rather than the ultimate denial of an application, the loss of sales, or the loss of a job. *See Wash. All. of Tech. Workers v. DHS*, 892 F.3d 332, 339–40 (D.C. Cir. 2018). Framing the injury as such, causation and redressability then derive from "[b]asic economic logic"—an agency's change of a competition's rules causes the injury and a court's invalidation of the change redresses the injury.

*Id.* (citing *Am. Inst. of Certified Pub. Accountants v. IRS*, 804 F.3d 1193, 1197–98 (D.C. Cir.

2015)).[4]

These cases are not directly on point. Nonetheless, the logic of these cases appears to apply to the facts here. The injury Plaintiffs complain of is being left with discharge paperwork that discloses their sexual orientation and for many, does not allow them to access benefits that would have been available to them but for Defendants' past unconstitutional policies, while being required to undergo a burdensome and even traumatic application process to obtain corrected paperwork. As plaintiffs are "able and ready" to engage in that application process, the Court concludes that their injury is imminent and sufficient to constitute actual injury for the purposes of Article III standing. Furthermore, the policy adopted in the Stanley Memo is the cause of Plaintiffs' imminent injury and will be redressed by the relief they seek, namely, prospective relief that requires Defendants to undertake a systematic review process that will result in correction of paperwork issued to veterans discharged on the basis of their sexual orientation or perceived sexual orientation. Therefore, the Court rejects Defendants' argument that Plaintiffs lack standing to bring their procedural due process claim.

b.  Exhaustion

As a preliminary matter, the Court notes that the legal theory that underpins Defendants' exhaustion challenge is not entirely clear. In the Motion, Defendants make a two-line argument about exhaustion, asserting that "even if Plaintiffs could establish standing to challenge military correction board procedures without utilizing such procedures, their claims would *still need to be dismissed as non-justiciable* because the Ninth Circuit requires exhaustion of military remedies." Motion at 12 (emphasis added) (citing *Wenger v. Monroe*, 282 F.3d 1068, 1072 (9th Cir. 2002)). Defendants continue, "[t]his includes exhaustion through a military correction board." *Id.* (citing *Arabe v. White*, 110 F. App'x 51, 52 (9th Cir. 2004)). In their reply brief, however, Defendants assert that the "lengthy argument on justiciability" in Plaintiffs' opposition brief misses the mark because "Defendants have not argued that review of a military correction board action is non-

---

[4] The Court notes that Defendants did not meaningfully respond to Plaintiffs' argument based on this line of case law, simply stating generally in their Reply that these cases are not applicable because they involved equal protection claims and here, "any denial of equal protection would have resulted from DADT polices, not from military correction board procedures." Reply at 5.

United States District Court
Northern District of California

justiciable. Rather, Defendants have argued that the Ninth Circuit requires exhaustion of the military correction board process before such claims can be reviewed in federal court." Reply at 5.

Defendants do not offer any clarification of their previous reference to justiciability in their Reply. Nor do they reconcile the statement in their Reply renouncing any such challenge with the fact that the primary case cited in the Motion, *Wenger v. Monroe*, 282 F.3d 1068 (9th Cir. 2002), addresses just that question. In particular, in that case, the court addressed whether the plaintiff's "claims challenged non-reviewable military personnel decisions, and thus were nonjusticiable under *Mindes v. Seaman*, 453 F.2d 197 (5th Cir.1971)," which sets forth the test adopted by the Ninth Circuit for determining whether military decisions are subject to judicial review. 282 F.2d at 1072. Nonetheless, one of the elements of justiciability under *Mindes* is "exhaustion of available intraservice remedies" and Defendants' exhaustion argument focuses on that element.

With respect to exhaustion, the court in *Wenger* court states:

> In the past, we have concluded that there are four circumstances in which exhaustion is not required: (1) if the intraservice remedies do not provide an opportunity for adequate relief; (2) if the petitioner will suffer irreparable harm if compelled to seek administrative relief; (3) if administrative appeal would be futile; or (4) if substantial constitutional questions are raised.

*Id.* (citing *Muhammad v. Secretary of Army*, 770 F.2d 1494, 1495 (9th Cir. 1985)). The court in that case went on to hold that under the facts of that case, exhaustion was excused under the first and third prongs because the plaintiff had already been forced to retire and the Army Board for the Correction of Military Records could not order that he be reinstated or rehired. *Id.*

Plaintiffs contend, as part of their discussion of the *Mindes* test, that the exhaustion requirement is excused "primarily because Plaintiffs' challenge is based on substantial constitutional questions of equal protection and due process." Opposition at 11 (citing *Downen v. Warner*, 481 F.2d 642, 643 (9th Cir. 1973); *Stein v. Mabus*, No. 312CV00816HBGS, 2013 WL 12092058, at *3 (S.D. Cal. Feb. 14, 2013)). Plaintiffs argue further that "the intraservice remedy of the Record Correction Process does not provide an opportunity for adequate relief and Plaintiffs and the putative class would suffer irreparable harm if required to pursue the individualized

34

Record Correction Process."  *Id.* Defendants reject both arguments in their Reply.  Reply at 5.  As

to Plaintiffs' argument that intraservice remedies are inadequate, Defendants assert, this

"argument is belied by the fact that 83.5% of service members in similar situations have obtained

relief from a correction board, including original Plaintiff Egland and Plaintiff Powell." *Id* at 5-6

(citing Motion at 10).  Nor have Plaintiffs raised substantial constitutional questions, Defendants

contend, for the same reason they fail to state a claim.  *Id.* at 6.

        The Court finds that exhaustion is excused because Plaintiffs have adequately alleged that

intraservice remedies are inadequate and that  being forced to use the military correction board

procedures  to remove information about their sexual orientation from their discharge paperwork

and upgrade their discharge status will cause them irreparable harm.  Defendants offer a statistic

they suggest shows a high success rate among applicants discharged on the basis of sexual

orientation to obtain corrected paperwork when they have, in fact, applied for such relief.  But that

statistic is not alleged in the complaint, as discussed above, and therefore is not properly

considered at this stage of the case.  Even if it were proper to consider Defendants' statistics, they

would not support Defendants' position in light of Plaintiffs' allegations that only a very small

percentage of veterans discharged based on sexual orientation have applied for correction in the

first instance.  Drawing all reasonable inferences in Plaintiffs' favor, these allegations, in

combination with Plaintiffs' allegations that the application process is burdensome, intimidating

and even traumatic, are sufficient as a matter of pleading to establish that intraservice remedies are

inadequate and being forced to utilize them causes these Plaintiffs irreparable harm.   As discussed

above, the Court also finds that Plaintiffs have raised substantial constitutional questions.

Therefore, the Court finds that Plaintiffs' allegations are sufficient to excuse them from exhausting

the military correction board procedures under the test set forth in *Mindes*.[5]

---

[5] The Court rejects Defendants' reliance on *Arabe v. White*, 110 F. App'x 51, 52 (9th Cir. 2004),
which is the only case other than *Wenger* Defendants cite in connection with their exhaustion
argument.  In *Arabe*, the panel, in an unpublished opinion, found that the district court did not
abuse its discretion by denying a post-judgment motion by the plaintiff "because he conceded that
he did not initiate exhaustion with the Army Board for Correction of Military Records until after
his district court action was dismissed."  While the court in that case cited to *Wenger*, it did not
include any discussion of the factors that excuse exhaustion discussed above to support its

United States District Court
Northern District of California

United States District Court
Northern District of California

### 3.  Standing based on Informational Privacy

Defendants challenge Claim Two, for violation of Plaintiffs' substantive due process right to confidentiality, under *TransUnion LLC v. Ramirez*, 594 U.S. 413 (2021). The Court finds this argument to be unpersuasive.

In *TransUnion*, the plaintiffs brought statutory claims under the Fair Credit Reporting Act ("FCRA") against TransUnion, a credit reporting agency, asserting that as to a class of over 8,000 individuals it had failed to "use reasonable procedures to ensure the accuracy of their credit files, as maintained internally by TransUnion." *Id.*  Of these individuals, it was alleged that misleading credit reports had been provided to third parties as to 1,853 of the class members but that the remaining class members' credit files were not supplied to third parties. *Id.*  The Court found that the former group had standing under Article III because these class members had suffered "injury in fact" in the form of reputational harm whereas the remaining class members did not suffer a "concrete injury" and therefore did not have standing to pursue their claims. *Id.* at 439.

The starting point of the Court's analysis in *TransUnion* is the principal that "courts should assess whether the alleged injury to the plaintiff has a 'close relationship' to a harm 'traditionally' recognized as providing a basis for a lawsuit in American courts." *Id.* at 424 (citing *Spokeo v. Robins*, 578 U. S. at 341). The Court recognized that "certain harms readily qualify as concrete injuries under Article III[,]" including "traditional tangible harms, such as physical harms and monetary harms[,]" but that "various intangible harms" also constitute concrete injury. *Id.* The Court explained:

> Chief among [these intangible harms] are injuries with a close relationship to harms traditionally recognized as providing a basis for lawsuits in American courts. . . . Those include, for example, reputational harms, disclosure of private information, and intrusion upon seclusion. . . . And those traditional harms may also include harms specified by the Constitution itself.

*Id.* at 425. The Court went on to conclude that as to the individuals whose credit files had never been disclosed, there was no concrete injury because there was "no historical or common-law analog where the mere existence of inaccurate information, absent dissemination, amounts to

---

conclusion. Nor did it include any discussion of the issues that were raised in the post-judgment motion.  Thus, *Arabe* does not offer any guidance to the Court on the exhaustion question.

concrete injury." *Id.* at 434 (quoting *Owner-Operator Indep. Drivers Ass'n, Inc. v. United States Dep't of Transportation*, 879 F.3d 339, 343 (D.C. Cir. 2018)).  In sum, the Court concluded, "[i]n cases such as these where allegedly inaccurate or misleading information sits in a company database, the plaintiffs' harm is roughly the same, legally speaking, as if someone wrote a defamatory letter and then stored it in her desk drawer. A letter that is not sent does not harm anyone, no matter how insulting the letter is." *Id.* at 425.

Defendants rely on *TransUnion* for the broad proposition that there can be no standing to bring a claim involving privacy rights where there has been no disclosure of the private information to a third party.  The Court, however, finds that *TransUnion*'s holding is not so broad. In particular, that case looked to common law to determine whether the harm constituted a concrete injury because the plaintiffs in that case asserted only statutory claims.  Had they asserted constitutional violations (and stated viable claims based thereon), the Court likely would not have needed to look to common law because, as the *TransUnion* court recognized, "traditional harms may also include harms specified by the Constitution itself." As discussed above, the Court finds that Plaintiffs have stated a viable claim for infringement of their constitutional right to informational privacy based on the theory that the policy adopted under the Stanley Memo is the functional equivalent of disclosing Plaintiffs' private information.  Therefore, the Court finds that *TransUnion* does not require that Defendants must have disclosed their confidential information to a third party in order for them to have standing to assert this claim.

**D.   Whether Plaintiffs' Claims Should be Dismissed Because They are Untimely**

There is no dispute that Plaintiffs' claims are subject to the six-year limitation period under 28 U.S.C. § 2401(a). Nor do Plaintiffs dispute that they were discharged and received their discharge paperwork more than six years before this case was initiated.  Plaintiffs, however, argue that the date of discharge and issuance of their paperwork is not the date their claims accrued because their claims are not predicated on their discharge but instead, on the policy announced in the Stanley Memo. *See* Opposition at 6 n. 5. They further contend Defendants' challenges based on timeliness fail because: 1) Plaintiffs have suffered new injuries within the limitations period that make their claims timely under the continuing violation doctrine; and 2) they have adequately

alleged that the statute of limitations has been tolled.  The Court finds that as a matter of pleading, Plaintiffs' claims are timely and in the alternative, that they have alleged sufficient facts to establish that their claims have been equitably tolled.

### 1.   Continuing Violation Doctrine

Defendants contend there is a "wide body of case law" and "binding precedent" to support their position that Plaintiffs' claims accrued at the time of discharge and therefore, that they are time-barred.  There is no doubt that there is authority that establishes that a claim challenging a service member's discharge from the armed services accrues when the discharge occurs.  *See, e.g., Nichols v. Hughes*, 721 F.2d 657, 659 (9th Cir. 1983) ("[A] cause of action for wrongful discharge occurs at the time of discharge.").  Likewise, when a servicemember seeks reinstatement as a remedy for their wrongful discharge – including correction of discharge paperwork issued at the time of discharge to allow for reinstatement – such a claim also accrues at the time of discharge. *See, e.g., Mosley v. U.S. Dep't of the Army,* No. CV-13-02645-PHX, 2014 WL 12693819, at *4 (D. Ariz. May 12, 2014) (citing *Nichols*, 721 F.2d at 657, to apply the same accrual time for both Plaintiffs' request for reinstatement and her request to have her discharge documents corrected). These cases, however, involve claims where the primary harm at issue is the discharge itself.

The harm upon which Plaintiffs base their claims in this case is different.  Plaintiffs' claims are based on their inability to access, on an ongoing basis, the benefits that ordinarily accrue to veterans *after* discharge, such as health care, education and housing, without disclosing their sexual orientation – and in many cases, to access these benefits at all because of their less than honorable discharge  – because of Defendants' failure to systematically correct their faulty discharge paperwork, instead adopting a policy of requiring veterans discharged under DADT and similar predecessor policies to go through a burdensome and traumatic application process. Thus, the cases Defendants cite, which address straightforward challenges to discharges alleged to have been wrongful, shed little light on the question of whether the continuing violation doctrine applies in this case, or even, when Plaintiffs' claims first accrued.

The Court finds the injury that is at the core of this case flows from the policy decision, in 2011, that leaving service members discharged under DADT and predecessor policies with

1    paperwork that reflected their sexual orientation and in many cases,  an associated dishonorable

2    discharge, did not constitute an "injustice" or warrant comprehensive remedial action.  Under this

3    policy, these individuals could only obtain discharge paperwork that was *not* constitutionally

4    flawed by applying under existing correction board procedures.  Therefore, the earliest date

5    Plaintiffs' claims could have accrued was September 2011, when the Stanley Memo was issued.

6    The further question that must be resolved is whether Plaintiffs have adequately alleged that they

7    have continued to suffer new injuries, including injuries within the limitations period, because

8    Defendants have continued to follow the guidance in the Stanley Memo.  The Court finds that they

9    have.

10          Under the continuing violation doctrine, "[w]hen the continued enforcement of a statute

11   inflicts a continuing or repeated harm, a new claim arises (and a new limitations period

12   commences) with each new injury." *Flynt v. Shimazu*, 940 F.3d 457, 462 (9th Cir. 2019) (citing

13   *Kuhnle Bros., Inc. v. Cnty. Of Geauga*, 103 F.3d 516, 521-22 (6th Cir. 1997)).  In *Flynt*, for

14   example, the plaintiffs challenged the constitutionality of certain state laws that prevented

15   licensees of California cardrooms from owning more than a one-percent interest in any out-of-

16   state entity that engages in casino-style gambling activities.  940 F.3d at 459-460.  Although the

17   plaintiffs had received an adverse decision from the California Gambling Commission challenging

18   these statutes more than two years before, and the applicable limitations period for challenging

19   such a decision was two years, the court found that there were ongoing injuries alleged in the

20   complaint that were within the limitations period and therefore, that the claims were timely.  *Id.*  at

21   463.  In particular, it pointed to allegations relating to the plaintiffs' "present inability to invest"

22   and identified "specific forgone investment opportunities from 2014 and 2015" that fell "well

23   within the period."  *Id.*  Similarly here, Plaintiffs continue to be subject to the approach adopted in

24   the Stanley Memo and, to the extent they have not applied to have their discharge paperwork

25   amended under the military correction board procedures, they continue to be unable to access

26   veteran's benefits or to be required to disclose their sexual orientation in order to access those

27   benefits.

28          Other cases cited by Plaintiffs as examples of scenarios in which the continuing violation

doctrine was found to apply also involved constitutional challenges to the continued enforcement of statutes, policies or practices, as is at issue here.  For example, *in Virginia Hosp. Ass'n v. Baliles* (*"Baliles"*), the plaintiff was a hospital association that challenged a plan adopted by the State of Virginia for reimbursing hospitals for the costs of treating Medicaid patients. 868 F.2d 653 (4th Cir. 1989), aff'd sub nom. *Wilder v. Virginia Hosp. Ass'n*, 496 U.S. 498 (1990).  The parties agreed that the pertinent limitations period was two years and that the plaintiff's cause of action first arose when Virginia enacted its current reimbursement plan, which was almost four years before the complaint was filed.  Nonetheless, the court found that the continuing violation doctrine applied because "[t]he continued enforcement of an unconstitutional statute cannot be insulated by the statute of limitations[.]"  *Id.* at 663 (citation omitted).

In *Baliles*, the court cited to *Brown v. Board of Education*, 347 U.S. 483 (1954) – a case upon which Plaintiffs also rely. There, the Court allowed plaintiffs to proceed with a class action that challenged decisions by a number of states to segregate their schools, even though those decisions had occurred decades before, assuming that the claims were timely.  Likewise, in *Palmer v. Bd. of Educ. of Cmty. Unit Sch. Dist. 201-U, Will Cnty*, another case involving constitutional challenges to a school assignment plan that was alleged to be racially discriminatory, the court found that the applicable limitations period did not preclude claims by children whose original injury – which occurred when they first enrolled in school – fell outside the two year limitations period because the school district committed a new wrong "each day a child is assigned to school under a racially discriminatory policy."   46 F.3d at 683, 685-686.

The court in *Palmer* illustrated the distinction between cases where there is only a single injury and those involving an ongoing violation with an analogy to employment law, explaining that an employer may take "one dispositive act" that is "like a punch in the nose."  *Id.* at 685-686. In that case, the claim accrues at the time of the first injury even though "this act may lead to injury in the future."  *Id.*  at 686.  In contrast, "[a] series of wrongful acts . . . creates a series of claims."  *Id.*  For example, "[a] public employer that applies different salary schedules to black and white employees commits a new wrong every pay period, and the fact that the employer has been violating the Constitution for a generation does not permit it to commit fresh violations."  *Id.*

1     (citations omitted).  Applying this distinction to the facts of *Palmer*, the court found the latter

2     scenario to be analogous, reasoning:

3              Every fall the school board decides which buildings to use and which
              children shall be assigned to which schools. If, as plaintiffs believe,
4             the school board's explanation for closing Deer Creek is a pretext for
              discrimination, then each year's decision to leave the building
5             shuttered is a new violation—as is each assignment plan that compels
              black pupils to board busses for a distant junior high school that they
6             would not be required to attend if the population of University Park
              had a lighter complexion.

7

8     *Id.*

9              Here, Defendants argue that none of the cases discussed above applies because of a critical

10    distinction, namely, that DADT and similar predecessor policies are no longer being enforced and

11    indeed, that they were expressly rescinded more than twelve years ago.  In particular, in *Log*

12    *Cabin Republicans v. United States*, 658 F.3d 1162, 1166 (9th Cir. 2011), overruled on other

13    grounds by *Bd. of Trustees of Glazing Health & Welfare Tr. v. Chambers*, 941 F.3d 1195 (9th Cir.

14    2019), the Ninth Circuit found that the plaintiff's claims seeking a declaration that DADT and its

15    implementing regulations were unconstitutional became moot when DADT was repealed because

16    the repeal of that statute gave the plaintiff " 'everything' its complaint 'hoped to achieve.' "658

17    F.3d at 1166 (quoting *Chem. Producers & Distributors Ass'n v. Helliker*, 463 F.3d 871, 876 (9th

18    Cir. 2006), overruled on other grounds by *Bd. of Trustees of Glazing Health & Welfare Tr. v.*

19    *Chambers*, 941 F.3d 1195 (9th Cir. 2019)).

20             Defendants appear to misapprehend the theory of Plaintiffs' claims, however.  As

21    discussed above, the focus of Plaintiffs' claims is Defendants' decision, in the wake of the repeal

22    of DADT, to adopt a policy that places the burden on veterans discharged based on sexual

23    orientation to individually apply for correction of their paperwork rather than undertaking a

24    systematic review of all discharge paperwork that was issued by Defendants under DADT and

25    predecessor policies. There is no dispute that the system put into place under the Stanley Memo

26    remains in place and continues to be enforced. Plaintiffs claim that this system limits access to

27    benefits for Plaintiffs and the putative class members and forces them to disclose their sexual

28    orientation even as to benefits to which they may still be entitled.  The *Log Cabin Republicans*

United States District Court
Northern District of California

case does not bar such a challenge as the court in that case did not address claims aimed at a policy adopted *after* the repeal of DADT regarding how the discharge paperwork of veterans discharged under DADT would be handled.

The Court therefore concludes that the allegations related to Plaintiffs' ongoing inability to access a wide array of benefits to which veterans are entitled following discharge because of Defendants' policy of requiring them to engage in a burdensome application process to obtained "corrected" paperwork are sufficient to establish that the continuing violation doctrine applies.  As in the cases discussed above, Plaintiffs suffer new injuries attributable to Defendants' each time they must present their paperwork disclosing their sexual orientation to obtain benefits or are unable to access benefits that would have been available to them had they not been discharged under Defendants' past unconstitutional policies and forced to bear the burden of seeking correction of that paperwork from Defendants.

For these reasons, the Court rejects Defendants' assertion that Plaintiffs' claims, as alleged, must be dismissed on the basis that they are untimely.

### 2.  Equitable Tolling

Plaintiffs contend the Court should allow their claims to go forward for the alternative reason that they have adequately pled that the limitations period was equitably tolled.  The Court agrees.

Equitable tolling applies where a litigant: (1) has been diligently pursuing their rights; and (2) failed to timely file because some "extraordinary circumstance" stood in his way.  *Doe v. Garland*, 17 F.4th 941, 946 (9th Cir. 2021). "As to the first element, '[t]he standard for reasonable diligence does not require an overzealous or extreme pursuit of any and every avenue of relief. It requires the effort that a reasonable person might be expected to deliver under his or her particular circumstances.'"  *Kwai Fun Wong v. Beebe*, 732 F.3d 1030, 1052 (9th Cir. 2013), aff'd and remanded sub nom. *United States v. Wong*, 575 U.S. 402 (2015) (quoting *Doe v. Busby*, 661 F.3d 1001, 1015 (9th Cir. 2011).  "Central to the analysis is whether the plaintiff was 'without any fault' in pursuing his claim."  *Id.* (quoting *Fed. Election Comm'n v. Williams*, 104 F.3d 237, 240 (9th Cir. 1996)).  As to the second element, "a litigant must show that 'extraordinary

circumstances were the cause of [their] untimeliness and . . . ma[de] it impossible to file [the document] on time.' " *Id.* (quoting *Ramirez v. Yates*, 571 F.3d 993, 997 (9th Cir. 2009)).

"Equitable tolling is typically granted when litigants are unable to file timely petitions as a result of external circumstances beyond their direct control." *Harris v. Carter*, 515 F.3d 1051, 1055 (9th Cir. 2008) (citation omitted). "Equitable tolling is typically denied in cases where a litigant's own mistake clearly contributed to his predicament." *Id.* (citation omitted). "Because the applicability of the equitable tolling doctrine often depends on matters outside the pleadings, it 'is not generally amenable to resolution on a Rule 12(b)(6) motion.' " *Supermail Cargo, Inc. v. United States*, 68 F.3d 1204, 1206 (9th Cir. 1995) (quoting *Cervantes v. City of San Diego*, 5 F.3d 1273, 1276 (9th Cir. 1993)).

Here, the FAC contains extensive allegations concerning the burdens and barriers that veterans encounter under the current individualized process. FAC ¶¶ 100-111. The burdens Plaintiffs allege are not mere inconvenience. Rather, Plaintiffs highlight aspects of the process that give rise to "[s]tigma, [r]e-traumatization, and [i]solation." *Id.* ¶ 110. For example, the process places the burden on applicants to prove "that the military committed an error or injustice warranting a record correction." *Id.* ¶ 105. "As a result," Plaintiffs allege, "review boards encourage veterans to submit comprehensive applications, including personal statements, statements from their military supervisors (who may have participated in the discrimination), letters of support from colleagues and friends (to whom the applicant must disclose the trauma of their discharge), private health records, evidence of good conduct both in the military and in the civilian community, and any other evidence that supports their request." *Id.* ¶ 106. Further, veterans who seek to submit applications confront an "intimidating" process and must agree to "monitoring and interception of their private information" before submitting the application. *Id.* ¶¶ 108-109. In sum, Plaintiffs allege, "[t]he record correction and discharge upgrade process fails to recognize that veterans who have been subject to discrimination are being asked to return to the very institution that discriminated against them and relive the humiliating and traumatic experience of their discharge while asking the institution to correct its own wrongs. Painful memories, feelings of shame, and traumatic discharge experiences create a barrier to accessing

available remedies." *Id.* ¶ 110.

In light of these allegations concerning the trauma that may be experienced by veterans who were discharged based on their sexual orientation or perceived sexual orientation and who seek to correct their records under Defendants' current individualized application process, the Court cannot say, as a matter of law, that Plaintiffs will not be able to show that they acted diligently and that their delay was the result of extraordinary circumstances. Rather, that question is better decided at a later stage of the case, after the record has been developed.

## IV.   CONCLUSIONS

For the reasons stated above, the Motion is DENIED. A Further Case Management Conference will be held on **July 17, 2024 at 2:00 p.m.** via Zoom, id. 161 926 0804, password 050855. The parties' joint case management statement shall be filed by **July 10, 2024**.

**IT IS SO ORDERED.**

Dated:  June 20, 2024

_____
JOSEPH C. SPERO
United States Magistrate Judge

United States District Court
Northern District of California

44